24-1895 Delux Public Charter, LLC v. County of Westchester As this Court observed in Prince v. Hampton, Congress enacted two federal statutes to foreclose a patchwork of uncoordinated and inconsistent airport restrictions that impede the national transportation system. The federal government has also determined that small air charter services like appellants with 30 or fewer seats per plane should be treated differently from the large commercial carriers and are subject to different security protocols that do not use TSA checkpoints. These distinctions are critical to national aviation policy because they expand consumer choice, competition, and make accessible the thousands of airports around the country that don't have TSA checkpoints. Westchester County, however, has something else in mind. The county seeks to override the federal policy distinction between large and small and instead require us to use the main airport terminal and its TSA checkpoints even though federal law provides otherwise. Westchester County's requirement that we use the terminal is preempted under both the Airline Deregulation Act and the Airline Noise and Capacity Act. As pleases the court, I'll begin with the ADA, which contains a broad preemption provision covering all laws related to price, route, or service. As the Supreme Court recognized, this is a broad preemption provision. There is an exception for proprietary powers. So why was the district court wrong to conclude it's within that exception? For three separate reasons, Your Honor. Number one, the requirement to use the terminal is fundamentally inconsistent with federal policy. Two, Westchester County has not shown that its requirement actually advances any proprietary interest. Indeed, they're inconsistent on what the purported proprietary interest even is. But three, as this court recognized in Francis of East Hampton, Westchester County has failed to follow the ANCA procedures because they never submitted this requirement in the 2005 regulations of the FAA. I'm sorry, that goes to ANCA preemption, correct? It goes to both, Your Honor. This court in Francis of East Hampton recognized that when the locality does not follow the ANCA procedures, that is not reasonable and it violates the ADA as well. So those are the main three reasons. There are several other reasons we cover in our brief. We rest on those arguments in the brief. But I would like to walk through, if it's okay with Your Honors, these three reasons for why the proprietary exception of the ADA and ANCA do not protect the county here. May I interrupt for just a moment? I have two questions, which you can either address in the presentation that you've just outlined for us or separately, as you think would be best. You know that your adversary relies very much on the fact that there was a view that this was grandfathered and that the 2005 version is just a variant on the grandfathered one. So if you want to address that in the course of doing this. The other question I have is federal law seems to say that charter flights do not include scheduled air transportation sold on individually ticketed or individually way-built basis. So I understand the county to be saying that's what you're doing, or at least that's at least what one of the defendants is doing, which takes you out of whatever protection federal law gives you. So to the extent you don't think we should accept that reasoning, I'd appreciate your addressing that too. Okay? Sure thing, Your Honor. And I'll actually start with those two questions and then double back and cover anything else that needs to be covered. So grandfathering, that goes to ANCA. And they did have some pre-existing laws and regulations even before 2004. And then in 2004 they wanted to codify three restrictions. And they were very clear in their letter to the FAA, and the FAA determined very clearly in its response there were three restrictions. The first one concerned the number of passengers in the terminal building. The second concerned the number of flights that can use the terminal gates because there are limits. And the third concerned aircraft weight. Those were the three restrictions that the FAA recognized. The county never presented a fourth restriction, the one it issued here. The restriction, the requirement that we use the terminal, that was never presented and it never existed. That's that all passenger service provided at the airport shall be provided at the terminal in the 2005 term. Exactly. That didn't exist before, Your Honor. It didn't exist in 2004. It didn't exist in midway in the 1980s. That came about only in 2005, and the county never presented that restriction to the FAA. So is it your position that they should do that or that they can't do that? They can still do it. They haven't done it, so this court should reverse it. Okay. Just like in Frensley's campus. I mean, I suppose just as a predicate, your position is that it's a limit on operations and therefore outside of the grandfather. Oh, yeah, absolutely. Is that the step? I say it's a reduction or a limitation. Okay. It's a two-way reduction or a limit on aircraft operations, and it certainly is. I mean, we're being effectively banned from the airport, so that is clearly a reduction or a limit. We can't use the terminal because we can't use the ESA checkpoints. This is effectively a ban on our operations. But why isn't that consistent with their general proprietary authority to manage the crowding potentially at the airport? And the fact that they didn't do it for several years under the 2004 and then 2005 version doesn't mean that it's not covered by those kind of rights that they have as managers. A couple of things, Your Honor. First of all, this goes to ANCA. The proprietary interest is not relevant to ANCA. That's relevant only to the ADA. The grandfathering question goes to ANCA, and these new restrictions, which existed only in 2005, or when we used the terminal, that was never presented to the FAA. And they should have done it. In 2004, they presented other restrictions to the FAA. They never presented this one. They knew they had to, and they did for the others. They did it for these, which are reduction or a limit on aircraft operations. They should have. They didn't, and just like the Friends of East Hampton, that's a basis to reverse. They can still go to the FAA. They can still do it. They should have, but they didn't. And the FAA can then address whether these are valid requirements. But there's a proper procedure in federal law that gives congressmen to centralize these determinations in the federal government. I mean there's no area where preemption should have more force than when it comes to national aviation policy. And that's why congress enacted these statutes, and congress simply said go to the FAA. And they did go to the FAA. And Friends of East Hampton, the court said that's a basis to reverse, and the same result should obtain here. The ANCA argument is extremely straightforward, and on that basis alone, this court should reverse. Turning back to the other issue about schedule, that's a second argument under ANCA. The first one is they're turning an option to use the terminal into a requirement. So that's definitely a reduction or a limit on aircraft operations. The second is the issue of schedule. And under federal law, at the time the 2005 regulations were enacted, we were not considered scheduled aircrafts. So we're not covered by the 2004 regulations that existed. Well, you weren't operating at all in 2004, 2005, the defendants. Am I right about that? Right. We personally weren't. Now, when you operate now, do you have a, what I'll call 135 certificate or certification from the FAA? Yes, Your Honor. So to the extent that the defendant, I'm sorry, to the extent that the county is saying, well, you're not really a charter operation. You're offering passenger, you're a passenger-carrying scheduled operation. That's at odds with your certificate from the FAA? It is because— I'm wondering if that's part of your preemption argument. That's why I ask. Yes, it is, because under ANCA, we have two separate arguments. One is they turned an option to use a terminal into a requirement to use a terminal. And on that basis alone, you've got a problem that should have presented at the FAA. Separate, second, independently, there's this issue about scheduled service because we would not fit within the 2004 regulations because we're not providing scheduled service. 2005, they changed it to include us. But that's a second, separate, independent reason why their regulations fail under ANCA. Two separate reasons. But this is really simple. They should have presented this to the FAA. And the FAA can work these things out. The FAA might disagree with us. We don't think they would. We think it's very straightforward. But this should have been presented to the FAA, and the county didn't do that. So under ANCA, this court should reverse. Now, present it to the FAA. I want to be sure I understand. On one hand, present it to the FAA to see if they agree that it's grandfathered the way they agreed with it for the 2004. Correct. And present it to the FAA for what other reason? Just for the grandfathering of the two issues. Yeah, just for the FAA. So just on grandfathering? Yes, because only ANCA is the one to require the FAA to get involved. But where would that leave you with your other argument under the other statute that you're saying? I mean, is going to the FAA? Is there any point in that with respect to the other statutory preemption argument that you're making? No, Your Honor. This court should reverse under the Airline Deregulation Act. But the Airline Deregulation Act doesn't have that mechanism for the FAA. Right. So this court wanted to address the ADA. It doesn't have to. Just reverse under ANCA and say go to the FAA. But if the court weren't doing that. But that goes to whether it's proprietary. Exactly, Your Honor. Now, does the FAA speak to that at all? Not formally in the statute. They could have views on this. And if they're going to be opining, we welcome their thoughts on this as well. But as a legal matter, no. I mean, under that. You don't object to the suggestion to get views of the FAA? I do and I don't. So, one, the proper way of doing it is they should ask for permission up front by going to the FAA. They shouldn't be asking now for the FAA to weigh in. So as a technical procedural matter, this court should reverse and have them do for the 2005 requirement exactly what they did for the 2004 requirements, go to the FAA. That's the proper mechanism. But second, here's the issue. They ran to state court to have enforcement proceedings against us, and they're refusing to stay those proceedings. If they agreed to stay those enforcement proceedings, we would not mind having this court get the FAA or TSA or anyone to weigh in. The trouble is it appears that whereas they're trying to slow this proceeding down, they wanted to speed up the state court proceedings before getting a decision from your honors. And we think that the two cases should be linked up. They shouldn't be proceeding in one and not the other. But as for the ADA, there's a very easy basis to reverse. Well, actually, I'd say two, at least two reasons to reverse under the ADA. Number one, the requirement to use the tribunal is fundamentally inconsistent with federal policy. As this court recognized in the preface of East Hinton, the proprietary exception is extremely limited, and the government must show that its policy is consistent with federal policy as well as being reasonable, non-arbitrary, non-discriminatory. The county can't show that its policy is consistent with federal policy because federal policy says we can't use the TSA checkpoints, and they're forcing us to use the TSA checkpoints. Under federal law, there's a limit of 30 seats, 30 seats or less. That's the rule. Under county, they numerically changed it to nine. But that's what they did in 2004, right? And to the extent they have their grandfathering argument, the nine passenger limit, what doesn't that carry through? What am I misunderstanding? No, because the FAA never addressed that. The requirement to use the terminal didn't even exist in 2004. But it was there in the policy, right? And everyone agrees that the policy was grandfathered. Under the 2004 policy, there's a difference of opinion about whether 2005 is something different or a mere clarification. No, we don't. With respect, Your Honor, we don't. The 2004 regulations did not have this requirement that we use the terminal. And I'll just respectfully refer Your Honors to page 26 of our brief, which shows the difference in language. And as for the Tufts themselves, the regulations, 2004 is on pages 320 to 334. 2005 is on 343. 2004 said that the section does not apply to any activities by airport users not providing passenger service or not using the terminal building or terminal ramp. We didn't have to use the terminal. It was an option. The next year, the county deletes that language and then has new language. All passenger service at the airport shall be provided at the terminal. And that definition of passenger service has this cutoff of million seats. That's all in 2005, and that was never presented. In 2004-2005, was there anything other than passenger air service at Westchester Airport? Oh, certainly, yeah, 2004. And so you're saying that this is in the 2004 one, it's if they opt to use the terminal. Exactly. So are you saying that if United Airlines or American Airlines in 2004 were flying an 80-passenger jet into Westchester Airport, it could say we're not going to use the terminal for that? It couldn't because they're a 121 carrier. They have different requirements, including under 49 CFR 1544.207. They have to use the screening mechanism, the PSA checkpoints. They're subject to all of Part C, E, and A of that chapter. They have no choice. They have to use the main terminal. They have to use the checkpoints. We're a different carrier, different time. Congress and FAA distinguish large and small, so we're separate. We're 135, 380 with 30 seats or less. Under federal law, that's categorically different. And this gets back to the AA point because they're trying to conflate these two separate types of carriers, treating us as one, subjecting us to the same security protocols in other restrictions, and that's fundamentally inconsistent. Well, as I understand it, that's not their primary concern because they were willing to work out something with you with respect to TSA checkpoints and all. But the question I have now for you is if your clients were to start operating 30 passenger flights four times a day, five days a week, so that that significantly increased the number of planes, small planes, albeit, coming in and out of the airport, you don't think it's within the proprietary authority of Westchester to say that they want you in the terminal lottery for how many flights you can bring into the airport? It wouldn't, Your Honor, for a few reasons. I'm glad you asked that question so we can go into it. Insofar as they're concerned with pollution, noise, other things that have been held to be within their proprietary oversight authority? Yes, Your Honor. And so, first of all, of course, they didn't present that as the purported proprietary interest below. Insofar as they're raising it now, it's unclear to me what their interest is, but it's worth it because they didn't raise it below. First of all. Second of all, they don't have evidence that our planes are noisy. In fact, they're quieter planes than the ones that typically fly, no evidence of any kind of environmental impact, and there's no evidence of any congestion. Well, your planes wouldn't have to be particularly noisy if, under the hypothetical that Judge Radji suggests, they're coming in at a frequency that is ten times what is currently the case. Isn't that right? Your Honor, and thank you for raising it, I just want to put it in context. So, at the Westchester County Airport, in addition to the major carriers, in addition to charters like us, you have a sea of other planes in terms of private charters, private jets, corporate jets, net jets, cargo jets, what have you. There's no restriction on any of them. There's no restriction on the airport, no restriction on the number of planes, number of passengers, number of uses of the runway. And, in fact, there's evidence in the record that they are below capacity. This is, I can respectfully direct your honors, the ECF 116-8 at 90, where the chairman of the county's advisory board said we could have considerably more traffic and still be less than some previous periods. There's no congestion on the runway, no congestion in the FBOs. There's no limit on the runways, no limits on the FBOs. There is no concern. At the very least, there would be a factual question, which would preclude summary judgment, a factual question of whether we're creating more noise and more environmental impact. And one thing I want to stress is they are saying we can fly in the FBOs as long as we have no more than nine seats as opposed to 30. So just to take one example, a real-world example, we could have 27 passengers on a plane, and that's impermissible. But under their view, we could fly the same planes, same noise, same environment impact, same planes, but just have only nine seats on them. And we can accommodate those 27 passengers by flying three planes. That's worse for noise. That's worse for the environment. That's worse for congestion. Don't you think they would expect that you would not be flying an airplane that was about a third empty regularly as a business matter? That wouldn't make sense. It's costly to fuel that. It would be very costly, Your Honor, and that shows why ultimately what they might be trying to do is reduce or limit aircraft operations, which is precisely why this is an ANCA problem, and they should have gone to the FAA in the first place. But let me just add— So I will—we've kept you well over your time, so you can finish your answer, and you have reserved three minutes for rebuttal. Thank you very much, Your Honor. So for those reasons, we respectfully advise—suggest that you reverse on ADA or ANCA, and reserve the remaining time for rebuttal. Thank you very much. Thank you, Mr. Cohen. Thank you. Good morning, Your Honor. Good morning, Mr. Cohen. I'm just a county attorney with me are my colleagues, Justin Nathan and Sean Carey, from my office. Good morning, Mr. Cohen. Good morning. Let me address the ANCA issue first. So this is a very different case than the friend that we sent, and I know, Judge Rouse, you were on that panel that decided that case because that case did not involve the issue of grandfathering. It did not involve an airport that had commercial service like American Airlines or United Airlines. It was a very different airport with a very different issue in that case. So the reliance upon that case is really misplaced. I mean, it gives us the basic principle that because these procedures are mandatory and comprehensible, local laws not enacted in compliance with them are federally preempted, which is a step in the analysis the other side. That's a step. And the question, I think, for this—that I would propose for this Court to decide respectfully is whether that 2005 amendment falls within the amendment exception to ANCA to retain the TUPs, the Terminal Use Procedures, grandfather status. It's our position it did not impose greater restrictions but, in fact, less of them. And therefore, we submit Judge Kaufman correctly concluded that the clarification in 2005 was a clarification of an existing practice. Let me ask you to expand on that a little bit, Mr. Nona, because it seems to me that the 2004 law that you submitted to the FAA for grandfather questioning really was focused on three particular things that you wanted clarified, and it didn't really say anything about who had to use the terminal, which is what the 2005 law now does. What am I missing? Well, let me address the language in the 2004 law—  —using the terminal was included in that, but it's also important to note that the requirement for scheduled passenger service or those airlines that were providing passenger service with a scheduled operation and selling seats to the public were covered prior to 2004 under the 1985 stipulation settling the bill, the Midway case, and under the 2004 grandfathering permitted by the FAA in their letter to the county in 2004. But let me address the language issue first. So the language, the critical language that the appellants are relying upon is a provision that says, quote, the terminal— Tell me what section you're in because I have the law in front of me right now. 712.462. Section? The applicability section. Okay, I've got it. Well, that says that those are the only people who can use it, the terminal ramp. It doesn't say that those airlines have to use the terminal ramp. And that's why the 2004 clarified that as the practice before 2004. Right, but did you include it in the 2004 law that you then said to the FAA, are we grandfathered? I don't see in the law where you say that airlines, as you defined them, those entities providing scheduled passenger service must use the terminal ramp. We would say, number one, the whole provision doesn't make sense. A scheduled passenger service does not actually— airlines providing commercial passenger service do not use the terminal. The whole law doesn't make any sense. And as I said, that's why the 2005 clarification was necessary, because that was the practice under the Midway stipulation, and I'll get into that, and what the FAA was told when it sanctioned the 2004 law. Well, that raises my other concern, though. You say this applies to scheduled passenger service. As I understand it, an airline operating under a 135 charter, under Federal 14 CFR Part 135, cannot be providing scheduled air transportation because the law says charter flights do not include scheduled air transportation. So to the extent you say that's what they're doing, are you attacking their 135 certification, and can you do that, or can only the FAA do that? Well, the 2004 law specifically included Part 135 carriers, as you can see in the applicability section, or the definition of an airline section. And so, therefore, Part 135 carriers were already included in the 2004 law. But how do I reconcile that tension? The Federal law says that it applies to charter flights. 135 and 380 apply to charter flights, and that charter flights do not include scheduled air transportation, but you want to bring scheduled air transportation within it. Well, it uses the term scheduled operations, I believe, in 212.5. That was the definition back in 1985, the definition of scheduled operations. That section of the Federal regulations did not exist in 1985, and, therefore, the term scheduled operations was used. But that's why the county, in the 2004 law, changed it to scheduled passenger service, which is a different terminology and can apply to Part 135 carriers. Okay, I think I may have misstated this a moment ago when I was referring to 135. That's for airplanes with 30 seats or fewer under the Federal regulation. It's 380 that defines a public charter. And as I understand it, one of your defendants does operate under a 380 charter, right? That's correct. So how do you bring it within the 2014 law, which doesn't refer to 380? What am I missing here? Part 380 operators are still conducting scheduled passenger service, which is a different terminology. But they shouldn't be under the Federal definition, so that's why I'm saying, don't you have to go to the FAA and say they shouldn't have a 380 charter or a 380 certificate? They're not a charter operation. They're scheduling flights. You see, you want to regulate a 380 certificate carrier, but a 380 certificate carrier under Federal law should not be providing scheduled air transportation. I think there's two different terminologies used. Scheduled operations is the term used in 212.5, I believe, not scheduled passenger service. We think that based upon the fact that the FAA knew in 2004, they were told that terminal use was not optional, that scheduled airlines were required to provide, to use the terminal. Why don't you just go to the FAA? Why don't you just get this cleared up by the FAA? Because we believe that the FAA, we believe the 2005 amendment to the 2004 law is subject to grant borrowing. It's a lesser restriction. It's not increasing the restrictions on the part 135 operator, who's the airline conducting the service here. But you want this court to say so when it seems the FAA should be the entity that says you're right. Unless the 2005 amendment is properly grandfathered as a result of the fact that it's not a greater restriction, because amendments to laws can be grandfathered if they do not create greater restrictions. And there was always a restriction requiring prior to 2004 in the Midway Settlement with respect to the— Well, let me ask you about that restriction. What the effect of what you're doing is would throw them into the lottery for how many— Right now, the planes or the carriers that are in the lottery are carrying 70, 100 whatever passengers, right? We've got—  Okay. They carry 30. So if they win the lottery, that will bump the airline that carries 70 or 80 or 100. Won't that be a reduction in service? There'll be far fewer people who are able to come through the airport at that point than there are right now. So you're reducing to that extent? It's still subject to the 240-passenger-per-half-hour requirement. So no matter how many passengers are on a plane, there's still that restriction, which was sanctioned by the FAA in 2005. Well, that goes to how many people can come through the airport. But isn't there—doesn't the lottery also limit the number of flights that can come in per hour? Four per half an hour. Right. And so if the winners of the lottery are the defendants, that will mean that flights—that fewer people will be able to come through the airport, practically speaking. Yes, it could affect the number of people that come through the airport. And so why shouldn't that be viewed as reducing service? The issue of whether the restrictions reduce access to the airport. They still have the opportunity to have access to the airport. Well, 50 people or 60 people won't. Fewer people won't have access to you. Access restrictions, I think, refer to the—I would submit refer to the airline itself having access, not to the number of passengers having access. So if the lottery winners—this is an extreme hypothetical—were all small airlines, and so they won the lottery and United and Delta and American didn't, you think that would be okay? That would be a reduction? They may be limiting the number of seats on the aircraft, but the aircraft they're using, I believe, is 737, so they're not smaller aircraft, necessarily. Well, I'm not sure we have that in the record, do we? I'm not sure either. Yeah, okay. Thank you. Could I continue with the analysis on that? Sure. And that's in the memo to the FAA that was sent in 2004 briefing materials. Now— What's the record site for that? I'll get to you in one second. That was—that's A—365 was a midway stiff with the FAA, and the county and the Department of Transportation agreed that the airport's principal function was for general aviation and with an emphasis on business use. And the commercial service function, that is the passenger service, would be relatively modest. That's in the appendix of 365. But—and you said that is going to the FAA with the restriction that all passenger service shall be provided at the terminal? Yes. By the way, the FAA was a party to that stipulation, as well as the Department of Transportation. Confirm that. But in the supplemental appendix, there are two memos submitted to the FAA, and both of them provide— I'll give you that in a second. Sorry, you said A— All the stipulations, let me make one more point about the stipulation. I just wanted clarification. A365, what—which paragraph did you read from? That is A365. Yes, so paragraph 1 points out that the parties, including the FAA and the county and the Department of Transportation, agreed that the airport's principal function at present or the foreseeable future is one accommodating general aviation with an emphasis on business use. By comparison, its commercial service function is relatively modest. That's paragraph 1. Paragraph 4 provides— I'm sorry, you're on page A365? A365, yes. Paragraph 1. Public use—okay, got it. And then paragraph 4 provides, the county has developed the mechanisms herein to allocate the airport's terminal capacity among scheduled airlines presently serving HVN and those scheduled airlines presently in desire to provide the service according to the future. According to the following criteria, then the restrictions are lifted. And just to connect the dots for me, what of that indicates that all passenger service shall be provided at the terminal? That the mechanism is being established to allocate the terminal capacity among scheduled airlines. So they're allocating the terminal among the scheduled airlines. They're required to use it. But then the FAA was told that seeking the grandfathering in 2004, the county submitted a memo to the FAA regarding the history of the use restrictions dating back to 1985 and subsequent Board of Legislators resolutions. The FAA accepted that commercial service would be modest, and the county was establishing a mechanism to reasonably and equitably allocate the terminal and ramp capacity among scheduled airlines seeking access to the airport. So the intent there is clearly that those entities need to use the terminal. And the FAA was advised in 2004, and the site for that is the Supplemental Appendix O2. The FAA was advised that the restrictions apply to scheduled commercial and passenger operations. And the FAA accepted these restrictions. And the FAA also concluded in its 2004 letter that the county's restrictions on access satisfied the county's grant assurances, which are important. Because the grant assurances require that county's restrictions be reasonable, non-arbitrary, and non-discriminatory. And the FAA found that in 2004. I'm sorry, I need to interrupt for just a second. The Supplemental Appendix at 025253 seems to be a memo from Westchester County to the FAA. And where is the FAA's acceptance? So there's a letter from them back. Very helpful. And the FAA found that the restrictions were grandfathered and found that the restrictions satisfied the county's grant assurances. And that's A374. It's a long letter where the FAA goes through the entire history of the restrictions from the Midway settlement onward. And concludes that the county's 2004 law is grandfathered. And that the county met its grant assurances in having those record restrictions. And agreed that the county could codify its county law in 2004. The restrictions already in place. And the issue was the 2004 law didn't fully articulate or fully set forth what had been required previously. That passenger service airlines needed to use the terminal. And that's why the 2005 law we submitted was a clarification. And in fact reduced the restrictions because of the nine passenger limits. And Judge Halpern concluded that it was a clarification and not an additional restriction of what already existed prior to that. Judge Halpern did a very long analysis of the Midway settlement and what happened after the Midway settlement. And what helps us confirm that the 2004 law revolved around scheduled passenger service. Which was a pivotal term but it seems not to have been defined. And then it was defined in the 2005 law. And that's to clarify what passenger service actually meant. It was selling seats to the public. So is there any dispute that that was the definition used in the 2004 law? No, I realize that. But it seems to me important to understand if we were to conclude that 2005 didn't change 2004. It merely clarified it. That the operative terms were used in the same way. It looks like in the 2005 law was the first time that the reference to aircraft designed for more than nine passenger seats. So that reduced the restrictions so aircraft designed for ten or less passenger seats did not have to use the terminal. And that's kind of consistent with the definition of communal operation under federal law. Okay, thank you. I need to come back to a question Judge Rodney asked about the language in the 2004 law. The appellants rely upon a section that says this section does not apply to any activities by airport users not providing passenger service. That's fine. I'm sorry, Mr. Nona. Would you please tell me what you're reading from again? I didn't get it in front of me. I apologize. I'm reading from section one of the 2004 law. Section 20. Let me, just give me a moment. Section one. Section one? Okay. Yes, yes, the very first section. Okay, please, thank you. I'm with you now. Appellants are relying upon the part that says there's not applied to any activities by airport users not using the terminal building or terminal ramp. And appellants argue we fit within that section. But you have to accept, you have to understand that in addition to airlines providing commercial passenger service, and those airlines not providing any passenger service, for instance, like a FedEx plane or an aircraft just carrying supplies or cargo, but there is a whole category of users of the airport that they're not required to use the terminal building because they're traditional charter flights, such as in the equal protection argument, you pointed out that appellants rely upon Baker's Bay as a highly relevant comparator. But Baker's Bay is limited. It's an affinity group that can only sell seats to members of the organization and can't sell seats to the public under 14 CFR 212.5. Similarly, a sports team is a passenger operation, but it's not a scheduled passenger operation. They don't have to operate out of the terminal because they don't sell seats to the public. So the appellants do not fit within that provision, the final phrase of the applicability section of the 2004 law that says not using the terminal building or terminal ramp. Those are entities that have traditional charter flights that are not like appellants who are selling seats to the public. Essentially, appellants are in competition with the commercial airlines because they're selling seats to the public and they don't want to use the terminal like commercial airlines. Yes, but our concern is not that analogy. It's whether or not the 2004 law, which the FAA has said is grandfathered, is basically the same as the 2005 law. The two changes they highlight in the applicability section are that you removed the word scheduled, so it's all passenger service, and that you put it in the affirmative, all passenger service shall be provided at the terminal, language that is nowhere in the 2004 law. I would only add that it's not all passenger service. It's passenger service that's defined in the 2004 law, which is selling seats to the public, so it excludes traditional charters that do not have to use the terminal because they don't sell seats to the public. I'm sorry. Help me out on that because looking now at the definitions, airline is any person providing passenger service in an aircraft designed for more than nine passenger seats. So even if it were what I will call an actual charter, a person owns a 12-seat plane and says, I want it to be ready to fly to London, Timbuktu, wherever on Monday, and he brings his guests on board, all 12 of them, none of whom individually bought their tickets, am I right that this language would require them to go through the terminal? Respectfully, I don't think so, Your Honor. Help me out. The airline shall be a person providing passenger service, and then passenger service means any air service for which seats are individually offered. And where are you looking for that so that I follow you? In the 2004 law, that section 2J. Right, but that's not in the 2005 law now. No, I think you're reading from 2005, right, from 2J. And my question is, if you keep reading, it says, comma, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charter, another airline, or any other entity. Yes, but a charter that's not selling seats to the public doesn't fall within that definition. Okay, so that's why you're saying that the individual seats have to be offered or sold. To the public, yes. So the guests on that hypothetical I gave you, they don't fall within this. Yes, Your Honor. Thank you. Thank you for helping me out. Thank you. I will ask you to, unless my colleagues have additional questions, to please wrap up, Mr. Nunez. Okay, if there's any questions about the Airline Deregulation Act, but we submit that the 2004 law satisfied the ADA and the 2005 law does as well, because these are reasonable, non-arbitrary, non-discriminatory restrictions. Thank you, Mr. Nunez. Mr. Cohn, you have three minutes, and I'm going to keep you to it. The other one, you want to do it? Of course. Thank you, Your Honor. Thank you. Thank you, Your Honor. Two quick points. First, Annika, the 2005 regulations turn an option to use the terminal into a requirement to use the terminal. Before 2005, there was no requirement to use the terminal. Midway did not involve requirements to use the terminal. That involved carriers that wanted to use the overcrowded terminal. Quite the opposite, there was no requirement to use the terminal until 2005. Well, let me ask whether that matters if the 2004 law did apply to entities that were doing scheduled passenger air service. And the 2005 law, especially with the J definition that we've just had highlighted for us, does the same. So in other words, both laws would have applied to your clients. Well, of course, as laid out in the briefs, we disagree that 2004 applied to scheduled operations, but putting that aside, the 2004 law, as laid out on page 26 of our reply, the 2004 law gave us an option to use the terminal. We were not required to use the terminal. Whether or not we were scheduled, we had an option but not a requirement to use the terminal. Only in 2005 was there a requirement to use the terminal. Mr. Nona referenced what he called a long letter from the FAA. Let's look at that long letter, starting with page 8376. And it says, the material provided by the county indicates that there are currently three restrictions in effect at the airport. One is the passenger limit in the terminal. The second is the four gate positions in the terminal. The third is the max weight of the planes. There is no fourth restriction that we use the terminal. There was no requirement that we use the terminal. Then turning to page 382, the FAA says, as noted above, the four restrictions at the airport are as follows. Lays out the same three restrictions, and the FAA concludes that those three restrictions were grandfathered. The FAA never addressed this fourth requirement that we use the terminal because the county never presented that to the FAA full stop. They should have. They should have gone to the FAA. And on that basis alone, this court should reverse. On the ADA, very quickly, their regulations are inconsistent with federal policy, treating large carriers the same as small, forcing us to use security protocols we're not allowed to use under federal law. This is far different from the minor things like weekend curfews that this court has blessed under the proprietary interest. And what they're actually suggesting would exacerbate congestion in the terminal by forcing us into the terminal. And there's no congestion elsewhere at the airport, despite the sea of private jets, corporate jets, private charters, net jets they use it, all of which are not being subjected to their policy. The proprietary interest is not being advanced. Indeed, it can't even identify what their proprietary interest is. For all these reasons, Your Honor, I thank you for your time, and I ask you to reverse. All right. Thank you to both counsel for your briefs and arguments. The matter is submitted and taken under advisement.